

THE ATTORNEY GENERAL

OF TEXAS

AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

August 30, 1960

General Ernest O. Thompson, Chairman
Railroad Commission of Texas
Austin, Texas

Opinion No. WW-926

Re: Whether the various
transactions of the West
Texas Gathering Company
constitutes utility
operation subject to
the Utilities Tax under
Article 6060, V.C.S.

Dear General Thompson:

You have asked several questions concerning the application
of the tax imposed by Article 6060 to the operations of the
West Texas Gathering Company. To answer these questions, it is
necessary to briefly discuss the provisions and effect of the
tax in question.

<u>SCOPE AND EFFECT OF ARTICLE 6060</u>

Article 6060, V.A.C.S., provides:

"Every gas utility subject to the
provisions of this subdivision on or
before the 1st day of January and
quarterly thereafter shall file with
the Commission a statement, duly verified
as true and correct by the president,
treasurer or general manager if a company
or corporation, or by the owner or one of
them if an individual or co-partnership,
showing the gross receipts of such utility
for the quarter next preceding or for such
portion of said quarterly period as such
utility may have been conducting any
business, and at such time shall pay into
the State Treasury at Austin a sum equal
to one-fourth of one per cent of the gross
income received from all business done by
it within this State during said quarter
period."

The scope of the foregoing article was limited by Section 10, H. B. 547 of the 46th Legislature (Acts of 1931, 42nd Leg., R. S., ch. 73, page 111), which reads:

"Sec. 10. That Article 6060 of the Revised Civil Statutes of 1925, except in so far as it imposes the license fee or tax of one-fourth of one per cent against persons owning, operating, or managing pipe lines, as provided in section 2 of Article 6050, is hereby repealed and said fund shall be used for enforcing the provisions of Articles 6050 to 6060, inclusive."

The pertinent provisions of Article 6050 are as follows:

"The term 'gas utility' and 'public utility' or 'utility', as used in this subdivision, means and includes persons, companies and private corporations, their lessees, trustees, and receivers, owning, managing, operating, leasing or controlling within this State any wells, pipe lines, plants, property, equipment, facilities, franchise, license, or permit for either one of more of the following kinds of business:

". . .

"2. Owning or operating or managing a pipe line for the transportation or carriage of natural gas, whether for public hire or not, if any part of the right of way of said line has been acquired or may hereafter be acquired by the exercise of the right of eminent domain; or if said line or any part thereof is laid upon, over or under any public road or highway of this State, or street or alley of any municipality, or the right of way of any railroad or other public utility; including also any natural gas utility authorized by law to exercise the right of eminent domain."

In summary, it is provided that the tax imposed by Article 6060 is to be paid by those in the business of owning, operating, or managing a pipe line for the transportation or carriage of

natural gas. In order to incur liability under Article 6060, the taxpayer must have acquired part of the right of way for the pipeline by the exercise of the right of eminent domain or be authorized to exercise the right of eminent domain, or the pipeline must cross a public highway or road, municipal street or alley, or railroad or public utility right of way. It must also be determined that the transportation of natural gas by pipe line is being carried on as a "business" activity; however, it is not required that such transportation be either the "sole" or "primary" business of the taxpayer. See Attorney General's Opinions O-3524-A and WW-625.

As pointed out by Opinion No. WW-625, each case arising under Article 6060 involves a fact question. A taxpayer might own, operate, or manage a pipe line and transport natural gas without being engaged in the business of transportation of natural gas within the contemplation of Section 2 of Article 6050. The Court in the case of Thompson v. United Gas Corporation, 190 S. W. 2d 504 (Tex.Civ.App. 1945, refused), pointed out that the Legislature, in regulating and controlling gas utilities, had divided them into three classification, and that these class-ifications represented three businesses: (1) production, (2) transportation, and (3) distribution and sale of natural gas. The Court stated that the utilities described in sections (1), (2) and (3) of Article 6050 have the right of eminent domain, and that each such utility necessarily carries on its business by the use of pipe lines. Accordingly, it was concluded that a company engaged solely in distribution of gas at retail was not in the business of transporting gas within the meaning of Section 2 of Article 6050.

Similarly, in Opinion O-3524-A, it was held that the Republic Natural Gas Company was not engaged in the business of transporting natural gas by virtue of its operation of a gathering system which brought gas produced by the company to a central point for sale. The rationale of the opinion was that the gathering system was operated as a necessary adjunct to the business of producing gas, and not as a separate business activity. To the same effect is Opinion No. WW-625. There it was held that a producer who, in order to sell gas from his well, found it necessary to lay approximately five miles of three-inch line to connect with a transmission line was not in the business of transporting or carrying natural gas within the meaning of section 2 of Article 6050.

In view of these authorities, it clearly appears that a person may transport gas by pipe line without incurring liability under Article 6060, if the transportation is not conducted as a business activity, but is carried on as a necessary adjunct

to another business, such as production or distribution. However, if the pipeline operation is not necessary to the successful prosecution of a business distinct from gas transportation, the owner, operator or manager of the pipeline will be liable for the tax.

The measurement of the tax is expressed in clear and explicit terms. It is imposed on the gross income received from all business done within the State of Texas. There is no provision for segregating income according to the type of business done.

It is in light of the foregoing principles that the questions presented by this opinion request must be resolved.

### WEST TEXAS GATHERING COMPANY OPERATIONS

The information submitted with the opinion request describes the operations of the West Texas Gathering Company under three separate headings. In order to give the questions posed the proper factual setting, it is necessary to briefly set forth the salient activities under each heading.

#### "El Paso Natural Gas--West Texas Gathering Company Transaction":

West Texas Gathering Company purchases and gathers gas in the Emperor Fields in Winkler County, Texas, which gas, after gathering, is transported by pipeline through the South Kermit Field, where additional gathering is done, and thence to the El Paso-Emperor Measuring Station where it is delivered and sold to El Paso Natural Gas Company for processing and transmission in interstate commerce. None of the right of way for the pipeline system was acquired by the right of eminent domain, but the line crosses various public roads, highways and railroads.

By order dated June 27, 1958, the Federal Power Commission found that this operation made West Texas Gathering Company a "natural gas" company within the meaning of the Natural Gas Act. A certificate of public convenience and necessity was issued to West Texas. The F. P. C. approved a "rate

---

[1] In this connection, it should be noted that under the express terms of the Act, it is not necessary that the carriage of transportation of the gas be for public hire; the pipeline carrier may transport his own gas or transport gas under private contract and still incur liability under Article 6060.

schedule "(contract between El Paso and West Texas) which provides, in effect, that West Texas is to purchase gas from the various producers at a specified price, and, after delivery and sale to El Paso, is to be reimbursed for the price paid the producers plus West Texas's cost of service, including a 6.5% rate of return on the undepreciated investment.

During the first year under F.P.C. regulation, West Texas paid the producers 16¢/MCF. An arbitrary and interim cost or service charge of 2¢/MCF was agreed upon, and El Paso was billed at a rate of 18¢/MCF. At the end of the first year, the actual cost of service was determined to be less than 1¢/MCF, necessitating a refund by West Texas of the amount by which El Paso was overcharged. After the first year, the basis for billing is the actual cost of service per/MCF for the preceding year. At the end of each year adjustment is made for underbilling or overbilling.

"Pioneer-Natural Gas Company--West Texas Gathering Company Transaction":

West Texas gathers a specific volume of gas for the Pioneer Natural Gas Company. This gas is purchased by West Texas in the Emperor Fields and transported through pipeline to the West Texas gas treating plant located near the El Paso Emperor measuring station. There the gas is treated for the removal of hydrogen sulphide and carbon dioxide. It then flows through approximately 26 miles of pipeline to Phillips Petroleum Company's Goldsmith Gasoline Plant, where sulphur compounds, water and liquefiable hydrocarbons are removed (during which process title is retained by West Texas), and thence to a point just down stream of the Phillips Gasoline Plant where Pioneer receives the gas from West Texas and title passes to Pioneer. West Texas purchases this gas for 16¢/MCF. The gas delivered to Pioneer is utilized in intrastate commerce. Part of it is used for irrigation pumps which are serviced by the Pioneer system.

"Miscellaneous Transactions of West Texas Gathering Company":

(1)  "Gathering of gas for Permian Basin Pipeline Company":

A certain amount of gas which West Texas gathers in the Emperor Fields is dedicated by the producer to Permian Basin Pipeline Company for sale in interstate commerce. This gas is transported by West Texas through the aforementioned pipeline to a point just short of the Kermit Field, where it is delivered to Permian. West Texas does not take title to this gas. For each thousand cubic feet of gas gathered for Permian, West Texas receives 0.5¢.

(2)   Gathering of gas that Pioneer Natural Gas Company purchases from Pan American Petroleum Company":

Pioneer Natural Gas Company purchases a certain amount of gas which is produced in the Emperor Fields from Pan American Petroleum Company.  This gas is delivered by Pan American into the West Texas gathering system and transported by West Texas to the point described under the second heading, above, where it is delivered to Pioneer.  Title to this volume of gas remains in Pioneer; West Texas receives 2¢/MCF for delivering it.

(3)   Revenue From Liquid Hydrocarbons:

West Texas receives a certain portion of the value of the liquids extracted in Phillips Goldsmith Gasoline Plant.  West Texas also collects from the field gathering system and markets a nominal amount of liquid hydrocarbons called "drip condensate."

## Questions and Conclusions

The first question regarding the foregoing facts is whether West Texas is subject to the tax imposed by Article 6060. West Texas is in the business of transporting gas from the place of production to various points for delivery and/or sale.  The gas is transported through a pipeline system which crosses certain public roads, et.[2] In view of the general discussion at the first of this opinion, it is clear that West Texas comes within section 2 of Article 6050 and is subject to the tax under Article 6060.

The second question concerns the receipts to which the tax is applicable.  As has been pointed out, the tax applies to the gross income received from all business done within the State of Texas.  There is not provision for segregating income according to the type of business done; nor is there any provision for dividing or allocating the gross income on any basis. cf: Steakley v. West Texas Gulf Pipeline Company, 336 S.W. 2d 925 (Tex.Civ.App. 1960).  Consequently, it is clear that the tax applies to (1) the gross income which West Texas receives

_____
[2] From the information submitted with the opinion request, it appears that West Texas does not consider that it is authorized to exercise the right of eminent domain, and that all rights of way  have been acquired through arms-length bargaining with the surface owners.  Since the terms of Section 2 of Article 6050 are couched in the alternative, we need not consider the question of whether West Texas actually has the right of eminent domain.

from the hydrocarbons (see No. 3 under "Miscellaneous" heading, above), (2) to the amount received for transporting gas in the instances where West Texas does not obtain title to the gas, and (3) to the sales price of the gas which West Texas purchases from producers and re-sells. In connection with the latter situation, it should be noted that in cases where an end-of-the-year "cost of service" adjustment is required, the tax applies to the amount actually and ultimately realized from the sale of the gas. [3]

The third question is whether West Texas may claim a refund for the tax paid on gas sold to Pioneer and ultimately used for irrigation purposes. Article 6060 comprehends no credit provision for gas used for irrigation or agricultural purposes.

### S U M M A R Y

The West Texas Gathering Company is subject to the tax imposed by Article 6060. The tax applies to the gross income from all business done by the company in Texas.

There is no credit provision contained in or comprehended by Article 6060 for gas used for irrigation or agricultural purposes.

Yours very truly,

WILL WILSON
Attorney General of Texas

By: Jack N. Price
Assistant

---

[3] Since the tax is to be paid quarterly, while the adjustment is made on an annual basis, an administrative problem concerning collection is presented. The simplest and most practical way to handle this problem is to make a corresponding adjustment in the tax at the time of the first quarterly collection after the annual "cost-of-service" adjustment is made. For instance, if West Texas bills El Paso for an additional amount, that amount can be taxed as part of the gross income for the quarter during which it is collected; if West Texas is required to refund a certain amount to El Paso, credit for the past overpayment of tax can be given by deducting that amount from the gross income of the company for the quarter during which the refund is made.

General Ernest O. Thompson, page 8 (WW-926)


JNP:bg

APPROVED:

OPINION COMMITTEE:
Henry Braswell, Chairman

Byron F. Fullerton
James R. Irion, III
Raymond V. Loftin, Jr.
John Reeves

REVIEWED FOR THE ATTORNEY GENERAL

By:   Houghton Brownlee, Jr.